Mr. Court, my name is David Dickison. I'm with the law firm Buchanan Ingersoll, and I represent the appellant, cross-appellee, SAMP USA Inc. in this case. This case examines the question of whether a jury had substantial basis for finding the existence of a contract when, one, no contract was revealed during pretrial discovery and erogatory responses, two, the plaintiff pled alternative theories of recovery inconsistent with the formation of contract, three, the plaintiffs testified that no contract was formed, four, the plaintiffs acknowledged they failed to conclude the negotiations to come to a written contract, five, none of the elements of contract formation were presented of offer, acceptance, or consideration, and six, the alleged terms of the contract were unknown to the defendant. Nonetheless, the trial court erred when it allowed the jury to consider a contract claim based on the assumption of the obligations of the D'Angeli contract. Many of these six factors are interrelated. For example, because the plaintiffs filed theories of recovery inconsistent with contracts, such as quasi-contract and unjust enrichment, SAMP USA tried to take discovery of what their theory was going to be, contract or quasi-contract. Kennedy, I don't want to interrupt you on a good role, but just to be clear, are you arguing there was no ever no contract deserving of compensation at all, or are you arguing that the terms that were ultimately determined against your client are what's at issue? Fisher, there is no contract here. No contract. Interrogatory 12 is a standard detailed request for contract formation elements. The D'Angeli contract is not even mentioned in response to interrogatory 12. No implied contract formed through silence is mentioned either, despite the specific request for any implied contract formation. SAMP USA relied upon that interrogatory response, yet Camerina was able to present new testimony at trial and argue that an implied contract was made in the jury argument in the closing argument. The Ninth Circuit has ruled in other cases that discovery requirements have meaning and they will be enforced. We cite the IMAX case versus Cinema Technology, Inc. as a case where the Ninth Circuit enforces those requirements. The MAI case is the second one cited from the Ninth Circuit. Second, Camerina admitted in pretrial discovery and during trial that he did not believe he had a contract with SAMP USA. Camerina's counsel states that the Court must disregard all evidence favorable to the moving party at this stage that the jury is not required to believe. But Camerina's admissions defeat the right to judgment under a line of cases cited by SAMP USA and left unrebutted by opposing counsel. The Court is required to believe that statements against interest are conclusive. The Eighth Circuit case of Barnett v. Terminal Railroad. The Tenth Circuit case of Kansas Transport v. Browning. The Supreme Court of Kansas, Bell v. Johnson. The Sixth Circuit in Bolland v. Louisville-Nashville Railroad. This principle regarding statements against interest is a matter of widely accepted evidentiary law. It's also a matter of judicial estoppel. Arizona also recorded. However, the attorney for the opposing party describes that as a statement made describing the declarant's state of mind at a particular time and that, well, perhaps early in negotiations you could believe there was not a contract. Subsequently, a contract could be formed. Your Honor, I understand the point you're trying to make, but there were numerous representations and there is contemporaneous correspondence throughout this entire time period, all of which indicate that there is no contract formed. There's correspondence, what is the commission rate going to be? When are we going to be paid? I understand that we cannot reach an agreement in November of 1997. All this contemporary correspondence, plus when you add in our specific request and discovery for identify the contract, give us the offer, give us the acceptance, give us the consideration, none of this is provided. And in the explicit admissions that I didn't think I came to an agreement with Mr. Camerina. I don't think he was thinking the same thing that I was thinking. We believe that that indicates that there cannot be a finding of contract in this situation. Kennedy. What do you do with the statement in the letter, exhibit 12, which says where Mr.  Colella. Colella. Said I discussed with Mr. DeRosa to keep a certain sum for you for these two projects, even though we are not obligated financially to you since your contract was with D'Angeli USA, and so on. Now, you said there's no evidence of any contract, and yet there's certainly evidence the jury heard about Mr. Camerina performing services with the knowledge and at least implicit awareness and consent of your client. Now, what does the jury do with that to say there's no, there's nothing at all, this is all a freebie and nothing for them to work with at all? If you examine that correspondence, it makes clear that we have no obligation to pay this. It also makes clear that it's not asking Mr. Camerina to do anything. It's simply a statement that we want to work with you in the future. We're going to set aside some money for you now. This is. Certain projects. Certain projects that they're pursuing. There is the GEHR project, G-E-H-R, where they offer a 2 percent commission. That is in writing. It's an offer. It's accepted. He goes out. He tries to do it. He cannot close the deal. But what are the two projects in the, that are referred to in Exhibit 12? There's. A certain sum for these two projects. That would be the Conductor's Monterey project in Monterey, Mexico, and the CSI project in Phoenix. And those aren't the ones that he got the. By the time that letter is written, those projects are closed. They're done. There is nothing more to be done with them. And did Mr. Camerina have anything to do with those? Mr. Camerina was working with D'Angeli. No, but he also continued to work after, too, didn't he? Mr. Camerina testified that everything he did was on his own initiative. He was not acting. Well, that may be. But you're saying there was no evidence of any contract. And what we're here trying to review is what the jury heard and whether it could infer from the evidence that there was an implied contract and an understanding. And you're saying, well, no, there's no evidence whatsoever, and that you relied on interrogatory answer number 12, and, therefore, all of this is just made out of whole cloth. And yet there clearly seems to be some evidence in the record of dealings between the two parties with respect to the contracts at issue and some notion that there may be compensation in some amount. Isn't there? There is a notion that there is going to be a payment in some amount, and, in fact, that is tendered later on. But the need to say that the outset, your position is there's zero contract, nothing at all. It's not a question of amount. It's a question of no contract at all, nothing at all. That's correct, Your Honor. I'm sorry. The notion that these sorts of vague statements back and forth create a binding contract is, I think, the problem that we faced with the trial judge and that we want to convince this Court that these vague notions and these vague discussions do not create a binding contract. If SAMHSA is simply accepting the debt to Mr. Camerino D'Angeli, that's a violation of the statute of frauds, that you cannot – it has to be in writing and it has to be some sort of a statement to get past the statement of fraud. But there is no request for Mr. Camerino to do anything, and so there's no consideration for this. Well, why didn't this letter of evidence get around the statute of frauds, that there's some indication in writing that there was a contemplation of some payment for the two projects? It may get around the statute of frauds with respect to there is some vague statement out there, but it doesn't show offer, acceptance, consideration, or any request for Mr. Camerino to do anything. Taking the benefits of a completed transaction which he had something to do with, why isn't that implicit acceptance? There is the benefit of that. I understand you disagree with it, but I'm just trying to understand why you're saying that there isn't enough for a jury. Because you say it's just too vague. Because Mr. Camerino himself says that he did not believe he had a contract. Well, he didn't. He didn't have a written contract. He did not have an agreement, Your Honor. Was the question that he had any contract whatsoever or did he have a written contract? What was the context of the question? There was a written con – oh, the interrogatory number 12? No, no. When you said, when he testified, when he answered that you've relied on his testimony, that he didn't have a contract. There are several places, but the most telling spot is he's asked, as of February 22nd, 1998, did you believe that you had a contract with SAMP USA? And he said no. Okay. And the context was of any sort, written contract, oral contract? With respect to CSI and Conductor as Monterey. All right. Thank you. Camerino's counsel fails to address the line of authority that with respect to these admissions, that they create an obligation for the trial court to take that issue away that a party cannot do better than his own judicial admission. But, you know, those cases are awfully old and they're all out of circuit. I understand that, Your Honor. There are no cases in circuit that deal with this issue and they're not addressed by the opposing counsel. No, I understand that. I mean, by saying that the trial court here was obligated to take that issue away from the jury based on his testimony that he didn't believe he had a contract, you know, that's a fairly – given all the years of contract law, we've decided in the Ninth Circuit, you can't come up with a single case that supports that here. It's a fairly bold proposition, I'd say. Your Honor, I think it's unusual for a jury to find that a contract exists and one of the parties – or both of the parties don't believe that there is a contract. And I think that's why it's a rarely found item. But it is an age-old provision of evidentiary law and judicial estoppel found throughout the country. Now, even if we assume that there is a contract, let's deal with the calculation of damages question. Here, I must emphasize that there is no dispute following that the written requirements of the contract results in a lower payment than what the jury calculated or what the jury adopted from the plaintiff. He claims that the guidelines were orally changed by the De Angeli to modify the way commissions were calculated. And we can all see the logical inconsistency of this position, that there's a binding contract and it's the De Angeli contract, but by the way, the De Angeli contract is not binding. It's only guidelines. We can change it and we have changed it. The De Angeli contract was never provided to SAMP USA prior to litigation. So despite the fact that Mr. Camarena can provide parole evidence about what this contract means to him, SAMP USA has no opportunity to provide parole evidence because it never saw the contract, never knew anything about the contract. And as a result of the parole evidence, apparently the jury has gone beyond the terms of the De Angeli contract, calculated in $204,000 of additional receipt, which was stipulated was never received, and has also calculated on a per annum basis instead of a per annum per client basis. Those are based on the written language of the De Angeli contract. Those are clear errors. This Court has the ability to interpret the contract terms and that should be corrected. Was the jury in the trial below advised that the $204,000 had never been received? Yes, Your Honor. It was stated by Mr. Camarena. It was stated by Mr. DeRose. It was testified to by all sides. Your Honor, I'd like to save at least two minutes for rebuttal, but I haven't been  Thank you, counsel. Good morning. Cameron Arteague for Fred Camarena. I'd like to address the appeal first. If I buy a house and a couple days later I see a landscape man coming up and I say, who are you? And he says, I'm the landscape guy. And I say, well, what are you doing here? And he says, I have a written contract with the owner of this house to do the landscaping. And I say, well, that interests me. Would you do my landscaping because I'm the new owner? And he says, sure. Will you pay me? And I say, yeah, I'll honor your contract 100 percent. Go ahead and do the landscaping. Now, has a contract been formed? I don't know. I would think so, but that's not for me to decide. There's no way you can conclude that a jury is out of bounds in saying that a contract has been formed in those circumstances. Here you have Anthony DeRosa calling up Fred Camarena within 72 hours after starting at SAMP, saying, Fred, we've got a problem. SAMP is known as a line drawing company and not an extrusion company, a distinction I hope the Court doesn't ask me to explain. But we're in the business of drawing lines. That's very good. But he says, I need your help. I need your credibility here because we're trying to sell this product. And Fred says, will you honor my commissions? The testimony is, Mr. Kalela says, we'll honor your commissions. Mr. DeRosa says, we'll honor your contract 100 percent. The jury hears that testimony. Then Fred goes to Mexico, makes calls on the customers, inspects the equipment, lends credibility to SAMP, and all this happens in August, September of 1997. The CSI contract is signed October 3, 1997. The purchase order is in the record. It's for $1,361,000, a point which I will return to presently. In testimony, Mr. Camarena is asked, they're going chronologically, as of February 22, 1998, did you think you had a contract with SAMP? And his answer is no. Now, I wasn't there. Your honors weren't there. I don't know what that meant or didn't mean. My suspicion is that Fred thought that, well, things had fallen apart so badly by February of 1998 that, no, I wasn't a sales agent for SAMP anymore. But that single question and answer does not bring down the jury verdict like a house of cards, when there is ample evidence in the record that a contract was formed between these parties. This hyper-technical concern for detail can be deflated by looking at Trial Exhibit 9. This is the offer that SAMP made to Fred Camarena to pay him a commission if he helped sell product to Gear Industries. The letter is Trial Exhibit 9. The operative sentence is, Fred, if you can assist us in closing the deal at the quoted price, we would offer a 2 percent commission, period. Well, how does that help you? Well, it shows that this is not some incredibly complicated commercial transaction in which umpteen variables need be nailed down. That's a contract. That's sufficiently specific and definite according to SAMP. And there's no reason in law why that has to be put in writing. There's never been a statute of frauds issue in this case. Well, this is in writing. So it wouldn't be a... No, I know this is, I know that Exhibit 9 doesn't relate to the contract that's, on which the jury verdict is based. All I'm saying is that it, SAMP acknowledges that that contract is, that statement is specific enough to contain all the requisites for a contract. Well, that may be with regard to the Gear contract that's notably absent in the other two contracts. And secondly, the commission rate's substantially below what he's claiming on the prior contract, the oral contract. So how does that... Those points are true, Your Honor. But I think you're... How does that help you? Well, I think it helps me. I cite the Gear contract just to show how simple the contract formation can be. I acknowledge that it's a lower commission rate. But to go down that road, Your Honor is quickly over, you know, overtaking the jury's function here. I mean, the jury determined that a contract was formed. There is no statute of frauds issue. The contract was formed orally. When Anthony DeRosa says, will you work for us, we'll honor your commissions, Fred goes ahead and works for them. And what we have in this case is sort of an oral contract that incorporates by reference, as it were, a written contract, namely the preexisting one that my client had with D'Angeli, the company that filed bankruptcy. This is a jury question. Was a contract formed here? And there's clear and ample evidence in the record to establish that a contract was formed. Does Arizona have, Arizona law provide for an executed oral agreement being sufficient to avoid the statute of frauds? Yes. One that's been completed. But those issues, that defense was never litigated in this case. It wasn't raised? Not raised. It may have been in the answer, Your Honor. I didn't check. But it was not throughout the entire trial and post-trial phase. The statute of frauds has never been an issue. As to the amount of the contract? Well, part of that may be because it looks like the theory asserted was quasi-contract and not contract. Well, both were pled. I mean, both were pled, which you're allowed to do under Rule 8. Right. And then you answer the interrogatory. Your co-counselor didn't say we don't have a contract. Well, this case is not here on an evidentiary objection or a discovery complaint. I understand. It's here on the trial court's decision not to overturn the jury's verdict. No, I understand that. But the fact is that it appears, looking, if you peek behind the curtain, as it was essentially proceeding under one theory and ended up getting tried on another. Well, I'm not sure that's entirely fair, Your Honor. Both theories were disclosed. Well, which is it? Is it a quasi-contract or an oral contract? It was both, Your Honor. Both issues were presented. If you look at the special verdict form that was submitted to the jury, there are four special verdicts. Was a contract formed? If your answer is no, then decide whether any compensation is owed under a quasi-contract theory. Well, the jury answered yes to the first special verdict. Was a contract formed. So the jury got to skip the quasi-contract verdict. And there was no need to determine how much was owed on that theory. Well, it's unusual to submit both contract and quasi-contract to the jury. Well, that may be, Your Honor, but it's not an error that has been claimed in this case. And I think we're testing the sufficiency of the evidence to support the contract. Well, Your Honor, I would just return to what I've already said, that if there is clearly a written contract in existence, if my landscaping guy has a contract with a former owner and I say, hey, will you do my landscaping, I'll honor that contract 100 percent, that's an oral contract. But it sort of incorporates by reference. Not in some states. I'm sorry, sir? Not in some states. Well, that is, it is in Arizona. I mean, you may have some things that create some enforceability of it here. And on your side, you have a very deferential standard of review. But there are some legitimate questions here raised. It's not a cut-and-dried case at all on whether an oral contract was formed. There may be, Your Honor. You yourself have used a very sort of a contract, an oral contract, that sort of incorporates a written contract by reference. Your Honor, you may well be right that there are interesting statute of frauds, contract formation questions that might have been raised and litigated in this case. The issue that's brought here is whether the jury verdict should be thrown out. And I submit that under that deferential standard of review, the jury heard adequate evidence and that the trial court properly declined to throw out the jury verdict. How do you explain the precise amount that the jury came up with? Fred Camarena testified that he marched through the arithmetic and submitted an amount of $77,416.80. The jury verdict was $153.05, less than the amount Mr. Camarena asked for. Right. I'm aware of no basis in the record that explains that $153.05 increment. And so what do we do with that? Well, because it cuts against my client. I mean, from my perspective, it's de minimis. I mean, if and, you know, the jury might have taken off $153 because they thought who knows, I guess. The same, you know, the standard for overturning a jury verdict is that it must stand unless it's, you know, passionate and monstrous and not justified by any view of the evidence. And here. I'm trying to get the view of the evidence that supports that amount. Well, I think that, you know, the difference is de minimis. It's a $153 difference. I understand that. But there's no explanation for it, right? That is correct. Okay. How does that impact your claim for prejudgment interest? Arizona law, Your Honor, requires that the demand be liquidated, not that the amount awarded by the jury be liquidated. So as long as you are able to present a demand that is arithmetical and not doesn't require reliance on opinion and discretion, it is liquidated. There is no issue segueing now to the cross-appeal that Mr. Camarena's claim in this case is liquidated. There is no dispute that his entitlement to interest exists, and there is no dispute that he adequately presented and preserved that claim. The only defense to interest presented by Sam is that Mr. Camarena testified that he had no entitlement to interest under the contract, which is true testimony as far as it goes. He likewise had no entitlement to attorney's fees under the contract and no entitlement to taxable costs under the contract. But the fact is, he's entitled to those, that remedy under the statute. And the statute applies unless there's a contract to the contrary. So we would like to see a remand. We'd like to see the judgment affirmed, but a remand for the inclusion of prejudgment interest in the judgment. But just so I understand how Arizona law works, if I make a demand for a contract, I say my demand is for $250,000. That's what I believe my contract claim is for, $250,000. And the jury awards $77,000. Then under Arizona law, because I made a mathematically calculable demand, then you can just run whatever the rate is times a number, whatever the jury picks, and you get prejudgment interest? Your Honor's point is half right and half incorrect. The fact that the jury awards. Colleagues always tell me. The fact that the jury awards less than the amount the plaintiff was asking for is clearly immaterial under the State law on prejudgment interest. You get prejudgment interest on whatever the jury awards as long as your initial claim was liquidated. And what's unclear from Your Honor's question is whether the $250,000 figure, if that's pulled out of the air and it's just kind of what I feel like asking for today, then it's not liquidated. If there's an objective basis so as to show that that amount is liquidated, then, yes, you would get interest on it. But you're relying on the fact it was a percentage of commission times a sale. Yes. The price of whatever the universe was. Yes. Even if there's a dispute about the total amount. Yes. Okay. Now, what about the $204,000 that counsel says clearly on the face of it, even under the best case, the DeAngeli contract, he shouldn't have gotten? The testimony is that Sam told Fred Camarena, your commissions will be honored 100 percent, not 90 percent, not 80 percent. And the amount of the sale, the commissions are calculated on the amount of the sale. The purchase order that was in evidence, Trial Exhibit 21 to Cable Systems International, is for $1,361,000. That's the amount on which Mr. Camarena calculated his commission for the jury. Now, Sam, for business reasons, decided to issue a credit to his customer. Trial Exhibit 5 says that Sam told CSI, hey, you can get a $204,000 credit on future purchases of other stuff you may want to buy from us in the future. The jury clearly could decide that, you know, that's Sam's problem. That's Sam's business decision. But the contract here was to pay Mr. Camarena commissions based on the gross amount of the sale and not the net amount of cash that Sam actually received. And that's what honoring your commissions 100 percent means. As to the fraud, we also would like a remand and reversal of the Rule 50 ruling. That is purely precautionary. The only thing we would hope to recover on a remand is punitive damages. Otherwise, we would like the judgment affirmed. Thank you. I'd like to reserve 30 seconds. Roberts. For your cross appeal? Okay. Briefly jumping to opposing counsel's statement that Mr. Camarena acknowledged that whatever agreement he believes he may have had at some point when he believes he has an agreement, he wasn't entitled to fees. He was not entitled to interest. This Court, in analyzing what law to apply, whether it's Maryland law or Arizona law, should be trying to strive to satisfy the expectations of the parties. The parties here have expectations that there's not going to be any fees, there's not going to be any interest. Mr. Camarena testified he didn't believe he was going to get any interest. This leads to a belief that Maryland law is more appropriate. It does not provide this prejudgment interest. Maryland law is more appropriate. It does not provide attorney's fees in contract claims. Counsel, when did you raise the argument that Maryland law would apply for the first time? Your Honor, there's a number of situations where this is raised with respect to different issues. Now, with respect to procedural issues, we acknowledge that Arizona law applied. But when issues came up that led to, well, first of all, we weren't aware that the contract was going to be this D'Angeli contract that's signed in Maryland. And once we were informed that this was their theory. Counsel, I think you're avoiding the question. When did you raise it? You can explain why you raised it late. But first, when did you raise it? We don't believe it was late, Your Honor. But we raised it certainly during the trial, during the jury instructions. Did you tender an instruction based on Maryland law? We tendered instructions for general law that would also include Maryland laws from a national horn book on jury instructions, which would be consistent with Maryland law. And that's what we argued to the Court. And what the Court decided was to take the Arizona version, meld in some slight versions of the national version, and present that to the jury in that respect. And our argument is not You objected to that instruction? Initially. But, Your Honor, our view is not that we are objecting to the instruction. We're objecting to the fact that the decision to go to the jury was based on Arizona law, as the judge interpreted it, that you could blue pencil in. If there are missing elements, you could add those elements in. That's what we're arguing, not that the jury was instructed improperly once it got the decision. With respect to the fraud case, Your Honor, let me quickly address that there's a distortion in the case that they say that there was a promise made in August of 1997 that his commission would be honored. In fact, that's not the case. And there's no testimony. He doesn't cite to anything on page 15 where he makes that statement in his brief because it's simply not true. There is no promise that he will be honored, which is then backed away from. That leaves the only thing relative to the fraud case as the false statement they can cite in January when it says that we have set money aside in a special account when, in fact, there is no physical separation of that money. Of course, he didn't rely on that statement. The work had already been done. There is no justifiable reliance on any false statement, and the fraud count was properly dismissed. Thank you for your time, Your Honor. We ask that the Court recognize that this case involves only $176,000, but that's more than 10 times the profit that Samp earned over the last decade. Counsel, you have rebuttal, but it's limited to your cross-appeal. Judge Robart is correct, I think, in stating that the Maryland law was never advocated by Samp until after the judgment was entered. And submitting a requested jury instruction based on a nationwide horn book cannot preserve your right to argue for the law of any of the 50 States after judgment. Thank you. Thank you, Counsel. Thank you. The case is here to be submitted.
judges: Thomas, Fisher, Robart